Michael J. McCue (Nevada Bar No. 6055)
mmccue@LRLAW.com
LEWIS AND ROCA LLP
3993 Howard Hughes Parkway, Ste. 600
Las Vegas, Nevada 89169
Tel:  (702) 949-8200
Fax:  (702) 949-8363

Robert Schaffer *(pro hac vice application to be submitted)*
rschaffer@LRLAW.com
David D. Weinzweig *(pro hac vice application to be submitted)*
dweinzweig@LRLAW.com
LEWIS AND ROCA LLP
40 North Central Avenue
Phoenix, Arizona 85004
Tel: (602) 262-5311
Fax: (602) 262-5358

Attorneys for Plaintiffs
VEGASTIX4LESS, LLC and
VEGAS.COM, LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| VEGASTIX4LESS, LLC, a Nevada limited liability company; VEGAS.COM, LLC, a Nevada limited liability company, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

**JURY DEMAND**

VEGASTIX4LESS, LLC, a Nevada limited
liability company; VEGAS.COM, LLC, a
Nevada limited liability company,

              Plaintiff,

      vs.

TIX CORPORATION, a Delaware corporation;
and TIX4TONIGHT, LLC, a Nevada limited
liability corporation,

           Defendants.

For their Complaint against Defendants TIX CORPORATION and TIX4TONIGHT, LLC,

Plaintiffs VEGASTIX4LESS, LLC and VEGAS.COM, LLC allege as follows:

## NATURE OF ACTION

1.      This matter concerns the Defendants' unlawful mission to dominate and monopolize two relevant markets: (a) the market for discount ticket distribution services sold to venues and producers of live events on and around the Las Vegas Strip; and (b) the market for discount tickets sold to theater patrons who attend the events.

2.      The current economic downturn has not spared venues and producers of live entertainment.  But venues and producers of live events on the Las Vegas Strip have noticed one area of continued growth – the discount ticket distribution channel.  And this channel has become an increasingly important source of revenue for them.

3.      The discount ticket distribution channel includes at least two distinct markets.  The first market consists of venues and producers that retain discount ticket distributors to market and sell their unsold tickets to consumers who visit high-profile storefronts on or about the date of performance for as much as 50% off regular box office prices.  In exchange for their products and services, the distributors charge and collect a commission from the venues and producers for each discount ticket sold.  The second consists of last-minute ticket sales from distributors to theater patrons who gather (and stand in line) at high-profile storefronts (located on the busiest spots of the Las Vegas Strip) to purchase a discount ticket.  The distributors charge and collect a transaction fee from each theater patron who purchases a discount ticket from their high-profile storefronts.

4.      Defendant TIX4TONIGHT, LLC ("Tonight") has long dominated both markets.  Defendants have undertaken an assortment of anticompetitive conduct to maintain Tonight's dominant position, including:

        a)      Defendants have restricted the freedom of venues and producers to pick their business partners and have instead forced them to deal with Tonight – to the exclusion of competitors.

        b)      Defendants have usurped the rights of venues and producers to establish the discount ticket distribution network of their choosing (in terms of

composition, scope and size), and have prevented the venues and producers from managing their discount ticket distribution channels as they see fit.

         c)       Defendants have threatened to and exacted retribution against producers and venues that hire Tonight's competitors to distribute their discount tickets.

         d)       Defendants have intentionally confused and misled venues and producers to believe that defendant Tix will soon own patent rights over the entire discount ticket business, and thus (once again) be the only game in town.

         e)       Defendants tried to bribe at least one businessman to exclude a competitor from opening a discount ticket outlet inside a popular mall, and then threatened the businessman when he refused.

         f)       Defendants have restricted the alternatives of theater patrons who want the fruits of competition – a superior customer experience with better products and services at lower prices (here, lower transaction fees).

         g)       Defendants have intentionally interfered with the relationships of Tonight's competitors and their actual and prospective customers.

5.     Plaintiffs file this action to stop the Defendants' anticompetitive practices, which violate federal antitrust laws (15 U.S.C. §§ 1, 2, 14) and constitute tortious interference; to recover treble damages for the Defendants' past and continued anticompetitive conduct (15 U.S.C. § 15); and to obtain injunctive and other equitable relief (15 U.S.C. § 26).

## PARTIES

6.     Plaintiff VEGASTIX4LESS, LLC ("VT4L") is a Nevada limited liability company registered to conduct and conducting business in the State of Nevada. VT4L is a wholly owned subsidiary of VEGAS.com, LLC.

7.     Plaintiff VEGAS.COM, LLC is a Nevada limited liability company registered to conduct and conducting business in the State of Nevada.

8.     Defendant TIX CORPORATION ("Tix") is a Delaware corporation with its principal place of business at 12001 Ventura Place, Suite 340, Studio City, California 91604. Tix

is a publicly traded corporation (NASDAQ: TIXC).  Tix is registered to conduct and is conducting business in the State of Nevada.

9.      Defendant Tonight is a Nevada limited liability company with its principal place of business at 12001 Ventura Place, Suite 340, Studio City, California 91604.  Tonight is a wholly owned subsidiary of Tix.  Tonight is registered to conduct and is conducting business in the State of Nevada.

10.     Each Defendant engaged in independent anticompetitive conduct as alleged herein.  Upon information and belief, Tix directed, controlled and encouraged the anticompetitive conduct and policies of Tonight, its wholly-owned subsidiary.

11.     Upon information and belief, Tix is the alter ego of Tonight.  Tix influences and governs Tonight with such a unity of interest and ownership that one is inseparable from the other and adherence to the corporate fiction of a separate entity would sanction a fraud or promote injustice.

12.     Various other persons, firms and corporations, not named as Defendants herein and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over the antitrust claims in the Complaint pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) and 28 U.S.C. §§ 1331, 1337.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 § U.S.C. 1367.

14.     The Court has specific personal jurisdiction over Defendants Tix and Tonight because they have purposefully availed themselves of the privilege of conducting business activities in the forum and the claims arise out of or relate to the Defendants' forum-related activities.  In addition, the Court's exercise of jurisdiction over the Defendants comports with fair play and substantial justice.  In addition, the Court has general jurisdiction over Defendant Tonight because it is a Nevada limited liability company with its principal place of business in

Nevada and it regularly conducts business in Nevada.  The Court also has general jurisdiction over Tix because it regularly conducts business in this District and it so closely controls and directs the operations of Tonight that it is chargeable with Tonight's contacts with and in the State of Nevada.

15.     Venue is proper in the District of Nevada because each Defendant transacts business or is found in the District, at least one Defendant resides in the District, each Defendant is subject to personal jurisdiction in the District, and a substantial part of events giving rise to the action occurred in the District.  15 U.S.C. §§ 15, 22; 28 U.S.C. § 1391.

## TRADE AND COMMERCE

16.     Defendants are engaged in interstate commerce and the unlawful conduct described herein substantially affects interstate commerce.

## DEFINITIONS

17.     The following terms have the meanings set forth below:

a)     "Relevant Markets" refers to the relevant product and geographic markets alleged in Paragraphs 18 and 19 of the Complaint.

b)     The "Show Corridor" consists of the area along and around a 3.8 mile stretch of Las Vegas Boulevard, known as the "Las Vegas Strip," and Fremont Street in downtown Las Vegas.

## RELEVANT MARKET

18.     This action includes two relevant product markets:

a)     the market for discount ticket distribution services that producers and venues of live events in the Show Corridor purchase from discount ticket distributors that, in turn, market and sell discounted tickets to theater patrons who visit their high-profile storefronts or kiosks on or around the date of performance (the "Distribution Market"), and

b)     the market for discount tickets (or ticket vouchers) that theater patrons purchase from discount ticket distributors at high-profile storefronts or kiosks on or around the date of performance to attend live events in the Show Corridor (the "Ticket Market").

/ / /

/ / /

19.     The relevant geographic market for the Distribution Market is the Show Corridor or, alternatively, the City of Las Vegas.  The relevant geographic market for the Ticket Market is the Show Corridor.

20.     The Distribution and Ticket Markets involve the sale of separate and distinct products and services from their alternatives (full-price ticket markets and scalper ticket markets) because of technical, economic, functional and financial reasons.  The Relevant Markets involve the sale of unsold tickets on or about the date of performance; the tickets are sold at substantial discounts of up to 50% off the regular box office price; theater patrons who purchase discount tickets most often receive ticket vouchers that must later be exchanged (at the venue's box office) for actual tickets; theater patrons are required to visit a brick-and-mortar discount storefront or kiosk in order to purchase discount tickets; neither theater patrons nor distributors know what shows or tickets will be available at the discount storefronts until on or about the date of show itself; consumers who purchase tickets in the Ticket Market might not otherwise attend a live performance; and venues and producers treat the discount ticket segment and Relevant Markets as separate and distinct markets from primary and secondary ticket markets.

21.     Upon information and belief, Tonight's share of the Relevant Markets has exceeded sixty-five percent (65%) at all times material hereto.

22.     There are high barriers to entry and expansion in the Relevant Markets.   For instance:

a)      Minimum efficient scale.  A prospective entrant must acquire distribution rights to a minimum portfolio of popular shows to attract consumers to its retail locations and to attract additional venues and producers to retain its discount ticket distribution services.  It must also attract enough customers to cover its substantial operating expenses.

b)      Close relationships.  The Distribution Market is uniquely dependant upon relationships with venues and producers.  Prospective entrants must establish and maintain a network of contacts with promoters and venues in order to secure discount ticket distribution rights to their shows.

/ / /

c)      Administrative, promotional, advertising and operating expenses. Prospective entrants must invest enormous sunk costs into their business before distributing a single ticket – none of which can be recovered if the venture fails.  Entrants must, for instance, incur substantial expenses to locate, hire and train personnel, meet payroll, manage inventory, and purchase or lease equipment and real estate.  Entrants must also incur promotional expenses to introduce their business to and attract the general public; and related continued expenses for collateral material, an Internet presence, etc.

d)      Rent commitments.  Prospective entrants must lease or purchase space at the busiest and most expensive spots on the Strip to open and operate their discount storefronts or kiosks.  And, once again, entrants must invest these enormous capital and lease costs before a single ticket is sold.  Upon information and belief, Tonight spends more than $1,000,000 each year to lease a single retail location at the Showcase Mall.

e)      Market concentration, a dominant incumbent and entrenched buyer preferences.  Tonight has dominated the Relevant Markets for several years.  Few competitors have emerged.  None have checked its substantial power.  Coupled with Tonight's low marginal costs, these factors serve to discourage prospective competitors from entering the Relevant Markets.

f)      Tonight's conduct.  Tonight's anticompetitive conduct and practices also serve to deter and prevent prospective competitors from entering the Relevant Markets, and thus protect Tonight's dominant position.

## **BACKGROUND**

23.    The ticket business generally consists of three distinct ticketing markets.  The primary market involves the initial sale of tickets from producers and venues to end-users at regular box office prices.  The secondary market involves the resale of tickets first purchased in the primary market and later resold – often at a premium.  And the discount market involves unsold tickets that consumers purchase at the last minute (on or around the date of performance) for substantially less than regular box office prices.

/ / /

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

514508_1

24. The discount market emerged in response to the predicament of unused inventory and attendant lost revenue opportunities. Producers and venues incur substantial sunk costs to organize and stage live events in the Show Corridor, which are later recouped from ticket sales to the events. Producers and venues have a finite opportunity to capture ticket revenues for each performance, which is lost when the curtains fall on the performance. And empty seats to the performance represent a total loss that will never be recaptured. Against this backdrop, producers and venues in the Show Corridor have recognized the concept of discount ticket sales, which enables them to capture revenues that would otherwise have been lost.

25. The discount ticket distribution business involves two distinct customer groups. The first customers are promoters and venues that acquire ticket distribution services from discount ticket distributors. The second are theater patrons who purchase the discount tickets (or ticket vouchers) from the distributors at storefronts or kiosks along the Strip and downtown.

26. The process has various steps: Promoters and venues inform their distributors what tickets are available for that evening's performances – typically before 10:30 a.m. on the performance date. The information is then disseminated to the distributor's high-profile storefronts or kiosks, where consumers must physically stand in line for the right to purchase less expensive tickets (from 20% to 50% less than regular box office prices) on a first-come, first-serve basis. Most often, the distributors provide consumers with ticket vouchers rather than hard tickets. Consumers must then take their vouchers to the respective venues and exchange them (at the box office) for hard tickets.

27. Discount ticket distributors are compensated by two independent sources for their products and services. Distributors receive a commission from their clients in the Distribution Market (*i.e.*, producers or venues) for each discount ticket sold. Distributors also charge and collect transaction fees from all customers who purchase discount tickets from them in the Ticket Market.

28. Tourists form the bulk of customers in the Ticket Market.

29. Upon information and belief, Ticket Market customers would often not attend a live show if not for the Ticket Market and the substantial discounts obtained in the Ticket Market.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

-8-

30.     Upon information and belief, Ticket Market customers often arrive at discount storefronts and kiosks with no particular show in mind but with the notion that they would like to see a show.

31.     Upon information and belief, Ticket Market customers are more likely to visit discount storefronts and kiosks that offer a broader selection of live shows, including the most popular shows.

32.     Defendants have explained (on several occasions) that many more discount tickets are typically available each day than Tonight sells in the Ticket Market.

### *Tonight*

33.     Tonight operates in the Relevant Markets – it supplies discount ticket distribution services to promoters and venues of live events in the Show Corridor, and it sells still-unsold tickets to customers at the last minute (on or about the date of performance) for discounted prices.

34.     Tonight opened its first Las Vegas discount ticket storefront in November 2002, where it sold discount tickets to a handful of shows.  As more producers and venues hired Tonight to distribute their discount tickets, Tonight was able to open several additional storefronts.

35.     Tonight now owns and operates eight high-profile storefronts, including a Showcase Mall location (under the Coca-Cola bottle).  Tonight characterizes its "prime" storefront locations as "billboard quality real estate" that Tonight "strategically" placed at the busiest locations in the Show Corridor.

### *A Concentrated Market*

36.     The Relevant Markets have long been concentrated and remain so.

37.     Tix prepared annual Form 10-KSB reports in accordance with the Securities and Exchange Act of 1934 for the fiscal years of 2004, 2005, 2006, 2007 and 2008 (hereinafter, the "investor reports").  Tix filed the investor reports with the United States Securities and Exchange Commission and Tix investors have relied upon them.

38.     Tix included a section titled "Competition" in each investor report, where Tix represented the precise number of "competitors [that Tonight has] in the Las Vegas market."

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

-9-

According to Tix's investor reports, the Relevant Markets have never had more than three competitors at any point since 2004.

*Tonight is the "Dominant Player"*

39.     Upon information and belief, Tonight has possessed and maintained a dominant market share in the Relevant Markets since at least 1994 – consistently in excess of sixty-five percent (65%).

40.     Upon information and belief, Tonight had two competitors in the Relevant Markets between 2004 and 2006.  Both failed.

41.     All Access Entertainment ("All Access") entered the Relevant Markets in February 2007, but has been unable to check Tonight's market power – as demonstrated by Tonight's uninterrupted growth and swelling profit margins.

42.     Upon information and belief, Tonight does not view All Access as a competitive threat.

43.     On March 26, 2009, Mr. Matthew Natalizio, Tix Corporation's Chief Financial Officer (CFO), told a group of Wall Street analysts: "We [are] almost the only game in town, there is one other discounter, one booth in Circus Circus. So, we have that."

44.     Tonight now has two competitors in the Relevant Markets – All Access and VT4L. VT4L entered the Relevant Markets in April 2009.

45.     A local newspaper compared the "two major players" in the Relevant Markets on October 15, 2009, which it identified as Tonight and All Access.  The newspaper's comparison demonstrated that Tonight was far superior to All Access in all respects.  All Access had far fewer live shows to select from; had far fewer "top name" shows to choose from; and had almost no exclusive contracts.

46.     Just weeks ago, in a November 2009 presentation to investors, Tix boasted that Tonight is the "dominant player in [the] Las Vegas market" for discount tickets and discount ticket distribution services.

/ / /

/ / /

47.     Tonight has entered contracts or understandings with Las Vegas producers and venues to distribute all or nearly all shows and attractions in the Distribution Market, including the most popular shows:

a)     According to its website, Tonight has distributed discount tickets "for every show on the Las Vegas Strip at one point or another."

b)     According to Tix's investor report – FY 2006, Tonight had contracts with venues and producers to sell discount tickets for 75% of "Las Vegas shows and attractions running at any one time."

c)     According to Tix's investor report – FY 2007, Tonight had contracts with venues and producers to sell discount tickets for 83.3% of "Las Vegas shows and attractions running at any one time."

d)     According to Tix's investor report – FY 2008, Tonight had contracts with venues and producers to sell discount tickets for 82.4% of "Las Vegas shows running at any one time."

e)     On March 26, 2009, Tix's CFO explained: "[I]n Las Vegas, there is about 80 shows on any one day.  We usually are selling between 70 and 75 shows each day."

### *Tonight Experiences Record Profits and Huge Margins — Despite Higher Prices and an Economic Meltdown*

48.     Tonight has experienced explosive growth since 2004.  Tonight's revenue from transaction fees (paid by theater patrons) and commissions (paid by producers and venues) increased around 720% between 2004 and 2008; from $1.56 million to $12.8 million.   And Tonight's gross ticket sales increased from $6.07 million in 2004 to $53.9 million in 2008 – an increase of around 788%.

49.     Tonight sold over 1,000,000 discount tickets to live events in 2008, and has equaled its entire 2008 output in the first nine months of 2009.

50.     Tonight's discount ticket sales have grown (and continue to grow) despite a consistent and substantial increase in the average ticket price charged to and paid by consumers in the Ticket Market.  According to Tix's investor reports:

a)     Between 2005 and 2006, the average ticket price increased from $28.25 to $36.38 (an increase of 28.8%); nevertheless, Tonight sold 79.7% more tickets in 2006, and its gross discount ticket sales grew by more than 125%.

b)     Between 2006 and 2007, the average ticket price increased from $36.38 to $48.39 (an increase of 33%); nevertheless, Tonight sold 27% more tickets in 2007, and its gross discount ticket sales grew by 45%.

c)     Between 2007 and 2008, the average ticket price increased from $48.39 to $50.88; nevertheless, Tonight sold 48% more tickets in 2008, and its gross discount ticket sales grew by 62% (to $53.9 million).

d)     Average ticket prices have continued to increase in the last 12 months from $50.88 to $56.48; nevertheless, Tonight has sold 32% more tickets.

51.     Upon information and belief, Tonight has increased the transaction fee it charges and collects from theaters patrons by at least 25% since 2004.

52.     Upon information and belief, Tonight has increased the commissions it charges and collects from producers and venues by a significant amount since 2004.

53.     Tonight continues to capture huge profit margins on its discount ticket sales, including a profit margin of at least 40% in March 2009.

54.     For the first nine months of 2009, Tonight's profit margin was at least 41% on its discount ticket sales.

55.     Upon information and belief, Defendants do not expect the current economic downturn to restrain Tonight's dominance in the Relevant Markets.  In a recent presentation to investors, Tix boasted that Tonight has "buck[ed] the Vegas trend" with "[r]evenues increased 45% year-over-year in [the] first nine months of 2009."

### DEFENDANTS' CONDUCT

#### *A Potential Threat … and Tonight Flips*

56.     Defendants viewed VT4L as an unacceptable threat to Tonight's uninterrupted growth and dominance that must be neutralized at all costs.

/ / /

57.     To extend and protect Tonight's monopoly power, Defendants have engaged in a series of anticompetitive activities.  Defendants have repeatedly used Tonight's dominant position in the Relevant Markets to extract exclusive distribution rights (express or *de facto*) from venues and producers who must deal with Tonight to the exclusion of competitors; have threatened and exacted retribution against venues and producers who retain VT4L for discount ticket distribution services; have confused and misled venues and producers to think that defendant Tix will soon own patent rights over the entire discount ticket business and once again be the only game in town; have tried to bribe at least one businessman into excluding VT4L from a popular mall, and then threatened him when he refused; and have interfered with the relationships of Tonight's competitors and their (actual or prospective) customers in the Distribution Market.

### An Immediate and Brazen Attempt to Eliminate VT4L Before It Can Even Open

58.     Upon information and belief, the Chief Executive Officer of Tix, Mr. Mitch Francis, learned in January or February 2009 that VT4L intended to enter the Relevant Markets in April 2009, and that VT4L would distribute discount tickets in competition with Tonight.  Francis learned that VT4L intended to distribute tickets from a small desk inside a camera shop at the Showcase Mall.

59.     Upon information and belief, Francis resorted to bribery in a naked attempt to restrain trade before VT4L even opened its doors and entered the Relevant Markets.

60.     Upon information and belief, in February 2009, Francis approached the businessman who had agreed to provide VT4L with a presence at the popular mall, and offered him $30,000/month not to do business with VT4L.  When the businessman refused, Francis threatened him with "war."

61.     Defendants later intensified their anticompetitive efforts when VT4L announced it intended to open a more substantial discount ticket location at the Showcase Mall.

/ / /

/ / /

/ / /

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

-13-                                                    514508_1

*Defendants' Crusade to Eliminate the Universe of*
*Prospective and Actual Customers Available to*
*Tonight's Competitors – Through Formal and Informal Means*

62.     Defendants have misused (and continue to misuse) Tonight's dominant position in the Relevant Markets to force venues and producers to grant Tonight the exclusive right to sell discount tickets to their shows.

63.     Upon information and belief, Defendants have refused to distribute discount tickets for producers and venues in the Distribution Market unless these customers agree not to sell discount tickets through VT4L.

64.     Upon information and belief, Defendants have told actual VT4L customers in the Distribution Market that Tonight will not distribute their discount tickets unless these customers abandon VT4L.

65.     Tonight has required written, express exclusive contracts from many venues and producers in the Distribution Market.

66.     Tonight uses a standard distribution contract that producers and venues are often required to sign.  It provides:

> **EXCLUSIVE RIGHTS:**  During the entire Term of this Agreement, [Tonight] shall have the exclusive right to sell Client's tickets at discounted prices within 72 hours of all shows covered under this Agreement.

67.     Tonight's standard distribution contract includes no right for producers or venues to terminate the contract, but instead vests total discretion to terminate in Tonight.

68.     Upon information and belief, Tonight has also extracted *de facto* exclusive contracts from many additional customers in the Distribution Market by threatening producers and venues that Tonight will not distribute discount tickets for their shows if VT4L is also permitted to distribute discount tickets.

69.     Upon information and belief, although additional distribution channels would translate into increased ticket sales and revenue for producers and venues, many have succumbed (and continue to succumb) to Defendants' threats.

/ / /

/ / /

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

-14-

70.     Upon information and belief, producers and venues want a viable alternative to Tonight in the Distribution Market, but are reluctant to cross the dominant incumbent due to Defendants' prior threats and acts of retribution.

71.     VT4L does not require exclusive rights from venues and producers to distribute their discount tickets.

72.     Upon information and belief, Defendants have caused producers and venues to terminate their then-existing distribution contracts with VT4L.  For instance, VT4L entered into a written, non-exclusive contract with a venue in July 2009 to distribute discount tickets to its show.  Within hours, the venue purported to rescind the contract and instructed VT4L not to sell its tickets.  VT4L was told that the venue was forced to enter an exclusive contract with Tonight to distribute its discount tickets.

73.     Upon information and belief, Defendants have no legitimate competitive justifications for their practices, which do not reduce distribution costs, facilitate competition or achieve efficiencies.

74.     Upon information and belief, the sole purpose of Defendants' conduct is to protect and extend Tonight's dominance in the Relevant Markets, and any purported legitimate business justifications are pretext.

75.     Any efficiencies or cost savings that Defendants might claim to achieve with their conduct could be achieved through alternative, less-restrictive means that do not harm competition.

76.     Tonight's exclusive contracts have foreclosed and continue to foreclose a substantial share of the Relevant Markets, and impede the ability of prospective and actual competitors to compete against Tonight on the merits.

77.     Upon information and belief, Tonight's exclusive contracts enable it to increase the barriers to entry and expansion in the Relevant Markets.

78.     Among other things, Tonight's exclusive contracts make it difficult for prospective and actual competitors to achieve efficient scale and attract a sufficient customer base in the Relevant Markets.

***Defendants Misrepresent Bogus Patent Rights***

79.     Defendant Tix applied for a patent in December 2002 that purports to cover the sale of discount tickets generally.

80.     Tix describes the invention, called "Ticket Distribution System," as "a system . . . for facilitating the distribution of unused theater tickets."

81.     Defendants' patent application includes almost no detail, but instead generally describes a central computer that box offices would use to transfer ticket information to consumers via retail kiosks, the Internet and telephones.  The application provides:  "The system includes a central distribution processor to which theater patrons are provided access for determining the availability of show tickets and purchasing available theater tickets at a discounted rate."

82.     In its most recent Form 10-Q, Tix wrote:  "After approximately eight years of effort, Tix Corporation has received a Notice of Allowance from the United States Patent and Trademark Office that it will soon be issued a patent for its inventions concerning discount ticket brokerage.  The Company believes the patent broadly covers the distribution of discounted tickets and encompasses the business it conducts under its Tix4Tonight subsidiary in Las Vegas."

83.     Tix also issued the following press release on September 21, 2009:

> Tix Corporation, an integrated entertainment company, today announced that it has received Notice of Allowance regarding the Company's United States Patent Application with the title of the invention, 'Ticket Distribution System.' A Notice of Allowance confirms that the patent application has been examined and is allowed for issuance as a patent and that the prosecution on the merits is closed.
>
> 'We are very excited to have achieved what we believe to be a major milestone as it may provide our Company with a number of distinct competitive advantages. This Notice of Allowance covers a number of the key aspects of discount ticketing operations and technological systems related to the distribution of unused tickets, which our wholly-owned subsidiary, Tix4Tonight in Las Vegas pioneered,' said Mitch Francis, chairman and CEO, Tix Corporation.

84.     Upon information and belief, the Defendants have told venues and producers that Tonight will have sole control of the Relevant Markets once the patent is issued.

/ / /

85.     Upon information and belief, the Defendants have used the amorphous (and still unissued) patent to mislead and force venues and producers into exclusive distribution contracts or understandings that require them to reduce output and restrict the distribution of their discount tickets to a single distributor – Tonight.

86.     Upon information and belief, Defendants have threatened retribution against all producers and venues that do not embrace Tonight as their exclusive distributor (either expressly or *de facto*) before the patent is issued – at which point Tonight will have regained absolute control of the Relevant Markets.

87.     Upon information and belief, Defendants' prospective patent is invalid and unenforceable.

88.     Upon information and belief, several producers and venues in the Relevant Markets have been misled by Defendants' misrepresentations about the supposed significance and imminence of the patent and thus designated Tonight as their exclusive discount ticket distributor.

## COMPETITIVE EFFECTS

89.     Defendants' anticompetitive practices have had a direct, substantial and adverse effect on competition in the Relevant Markets, including:

a)     Competition in the Relevant Markets between Tonight and its competitors (actual and prospective) has been suppressed and/or eliminated.

b)     VT4L has been foreclosed and excluded from a substantial portion of the Relevant Markets.

c)     Consumers in the Relevant Market (venues, producers and theater patrons) have been denied the fruits of competition, including better products and services, as well as increased and unrestricted choice.

d)     Producers and venues do not receive the benefits of price competition in the Distribution Market in the form of lower commissions for discount ticket distribution services.

e)     Theater patrons do not receive the benefits of price competition in the Ticket Market in the form of lower transaction fees and other benefits.

/ / /

f)      Customers in the Relevant Markets do not receive the benefits of innovation, including greater convenience and increased efficiencies.  VT4L, for instance, has access to state-of-the-art software and hardware that could eliminate the need for vouchers, saving a substantial amount of time and expense for customers (who no longer must arrive at the venue hours prior to a show in order to stand in another line) and venues (that no longer need additional staff at their box offices to exchange vouchers for hard tickets).  The system would further enable clients (venues and producers) to create and manage event manifests, as well as yield pricing.  And it would eliminate inventory problems and wasted product because all orders could be funneled through the system and distributors would receive their precise requirements – no more, no less. In addition, because all distributors would have access to the same inventory, the system would encourage competition on the merits (price and quality) and benefit the consumer.

g)      Customers in the Relevant Market do not receive the benefits of competition in the form of bundled products.  VT4L could offer a wide assortment of bundled products and services to customers, which, in turn, would increase output for venues and producers and lead to better deals for theater patrons.

h)      Left unchecked, the Defendants' conduct will continue its intended effect of harming competition in the Relevant Market.  Actual and prospective competitors will be excluded from the Relevant Markets and customers (producers, venues and theater patrons) will be forced to spend more (higher commissions and transaction fees) for less.

### FIRST CLAIM FOR RELIEF
### (Exclusive Dealing – 15 U.S.C. § 1)

90.    Plaintiffs incorporate by reference all allegations contained above.

91.    Defendants have entered into various unlawful contracts, combinations or conspiracies that unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

92.    Defendants have entered into arrangements with customers in the Distribution Market that prohibit the customers from acquiring discount ticket distribution services from Tonight's competitors.

93. The probable effect of the arrangements is to foreclose competition in a substantial share of the Relevant Markets.

94. Defendants entered into the arrangements with the purpose and effect of unreasonably restraining trade and commerce in the Relevant Markets.

95. Defendants' conduct has had anticompetitive effects in the Relevant Markets, including those described in Paragraph 89.

96. VT4L has been injured in its business or property due to Defendants' conduct.

**SECOND CLAIM FOR RELIEF**
**(Monopoly Maintenance – 15 U.S.C. § 2)**

97. Plaintiffs incorporate by reference all allegations contained above.

98. Defendants have engaged in unlawful monopoly maintenance in the Relevant Markets in violation of Section 2 of the Sherman Act.

99. Tonight possesses monopoly power in the Relevant Markets.

100. Through the anticompetitive conduct described herein, the Defendants have willfully maintained and, unless restrained by the Court, will continue to willfully maintain Tonight's monopoly power through anticompetitive and unreasonably exclusionary means.

101. Defendants have acted with an intent to illegally maintain Tonight's monopoly power in the Relevant Markets.

102. Defendants have directly and proximately prevented actual and prospective competitors from obtaining a significant, non-trivial share of the Relevant Markets.

103. Defendants' conduct has had anticompetitive effects in the Relevant Markets, including those described in Paragraph 89.

104. VT4L has been injured in its business or property due to Defendants' conduct.

**THIRD CLAIM FOR RELIEF**
**(Attempted Monopoly – 15 U.S.C. § 2)**

105. Plaintiffs incorporate by reference all allegations contained above.

106. Defendants have engaged in anticompetitive conduct in an attempt to monopolize the Relevant Markets.

107.   Defendants have acted with specific intent to achieve a monopoly in the Relevant Markets.

108.   Given Tonight's substantial market share and size, there is a dangerous probability that, unless restrained, Tonight will achieve monopoly power in the Relevant Markets.

109.   Defendants' conduct has had anticompetitive effects in the Relevant Markets, including those described in Paragraph 89.

110.   VT4L has been injured in its business or property due to Defendants' conduct.

**FOURTH CLAIM FOR RELIEF**
**(Clayton Act – 15 U.S.C. § 14)**

111.   Plaintiffs incorporate by reference all allegations contained above.

112.   Defendants have entered into agreements with venues and producers for the provision of discount ticket distribution services and related hardware and software.

113.   Defendants have conditioned the sale of their products and services on the precondition, agreement or understanding that producers and venues shall not use or deal in the products and services of competing distributors.

114.   The effect of the arrangements has been to substantially lessen competition in the Relevant Markets.

115.   VT4L has been injured in its business or property due to Defendants' conduct.

**FIFTH CLAIM FOR RELIEF**
**(Intentional Interference with Contractual Relations)**

116.   Plaintiffs incorporate by reference all allegations contained above.

117.   VT4L and VEGAS.com had existing contractual relationships with customers in the Relevant Markets.

118.   Defendants knew of the relationships.

119.   Defendants intended to cause harm to VT4L and VEGAS.com by inducing customers to terminate these relationships.

120.   Defendants actually disrupted VT4L and VEGAS.com's customer relationships.

121.   Defendants have no privilege or justification for their conduct.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

514508_1

122.    As a direct and proximate result of Defendants' unlawful conduct, VT4L and VEGAS.com have lost sales and goodwill, and will continue to lose sales and goodwill.  VT4L and VEGAS.com have suffered a loss of past profits and is likely to sustain a loss of future profits. Further, VT4L and VEGAS.com have sustained a reduction in the value of its business as a going concern.

**SIXTH CLAIM FOR RELIEF**
**(Wrongful Interference with Prospective Economic Advantage)**

123.    Plaintiffs incorporate by reference all allegations contained above.

124.    VT4L and VEGAS.com had prospective economic relationships with customers to distribute their discount tickets, with the probability of future economic benefits to VT4L.

125.    Defendants knew of the prospective relationships.

126.    Defendants intended to cause harm to VT4L and VEGAS.com by preventing these relationships.

127.    Defendants actually disrupted VT4L and VEGAS.com's relationships.

128.    Defendants have no privilege or justification for their conduct.

129.    As a direct and proximate result of Defendants' unlawful conduct, VT4L and VEGAS.com have lost sales and goodwill, and will continue to lose sales and goodwill.  VT4L and VEGAS.com have suffered a loss of past profits and is likely to sustain a loss of future profits. Further, VT4L and VEGAS.com have sustained a reduction in the value of its business as a going concern.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the following relief:

1.      Judgment on all counts in favor of VT4L and against Defendants, and judgment on counts five and six in favor of VEGAS.com and against Defendants;

2.      An award of compensatory, consequential, incidental, treble and punitive damages in an amount to be determined at trial;

3.      An injunction to enjoin and restrain the Defendants from continuing to violate the law;

4.      Attorneys' fees, costs and expenses of bringing this lawsuit, with interest at the highest legal rate until paid in full; and

5.      An award of such other relief that the Court may deem proper, necessary or appropriate.

DATED this 14th day of December, 2009.

Respectfully submitted,

LEWIS AND ROCA LLP


By:   /s/ Michael J. McCue
      Michael J. McCue (Nevada Bar No. 6055)
      mmccue@LRLAW.com
      3993 Howard Hughes Parkway, Ste. 600
      Las Vegas, Nevada 89169
      Tel:  (702) 949-8200
      Fax:  (702) 949-8363


      Robert Schaffer *(pro hac to be submitted)*
      rschaffer@LRLAW.com
      David D. Weinzweig *(pro hac to be submitted)*
      dweinzweig@LRLAW.com
      LEWIS AND ROCA LLP
      40 North Central Avenue
      Phoenix, Arizona 85004
      Tel: (602) 262-5311
      Fax: (602) 262-5358


      Attorneys for Plaintiffs